**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RODNEY L. BOLEN, | ) | CASE NO. 5:12-CV-3059 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE OLIVER |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | MAGISTRATE JUDGE |
| Acting Commissioner | ) | VECCHIARELLI |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Rodney L. Bolen ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying

his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be  REVERSED and REMANDED for

proceedings consistent with this Report and Recommendation.

**I.    PROCEDURAL HISTORY**

On June 9, 2005, Plaintiff filed an application for SSI, alleging a disability onset

date of February 11, 2004.  (Tr. 84.)  The application was denied initially and upon

reconsideration, and Plaintiff requested a hearing before an administrative law judge

---

[1]     On February 14, 2013, Carolyn W. Colvin became Acting Commissioner
of Social Security.  She is automatically substituted as the defendant in
this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

("ALJ").  (Tr. 41-43, 46-48.)  On May 8, 2008, ALJ Peter J. Martinelli presided over a

video hearing from Springfield, Massachusetts, with Plaintiff appearing and testifying in

Mansfield, Ohio.[2]  Plaintiff was represented by an attorney and testified.  A vocational

expert ("VE") also testified.  (Tr. 450.)  On May 29, 2008, ALJ Martinelli found that

Plaintiff was not disabled.  (Tr. 450-457.)  Plaintiff requested review of the ALJ's

decision, which the Appeals Council granted.  (Tr. 464-67.)  ALJ Martinelli presided over

a second video hearing on September 10, 2010, at which Plaintiff, Dr. Gerald Koocher,

an impartial medical expert ("ME"), and Kerry Skilin, an impartial VE, testified.  (Tr. 951-

992.)  Thereafter, the ALJ issued interrogatories to the VE.  (Tr. 591-598.)  On July 22,

2011, ALJ Martinelli presided over a third hearing, at which Plaintiff and the VE testified.

(Tr. 993-1004.)  On August 25, 2011, the ALJ found Plaintiff not disabled.  (Tr. 17.)  The

Appeals Council declined to review the ALJ's decision, making the ALJ's determination

the Commissioner's final decision.  (Tr. 9-12.)

On December 17, 2012, Plaintiff filed his complaint challenging the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this matter.  (Doc. Nos. 16 and 17.)

Plaintiff asserts the following sole assignment of error:  the ALJ failed to properly

address medical source opinions.  (Plaintiff's Brief ("Pl. Br.") at 19-26.)

## II.  EVIDENCE

### A.    Personal and Vocational Evidence

---

[2]      A transcript of this hearing was not included in the copy of the Transcript
of Proceedings before the Social Security Administration, and there is no
record of a request by Plaintiff that the Transcript be supplemented to
include the omitted portion.

Plaintiff was born on August 7, 1983, and was 21 years old on the date he filed his application for benefits.  (Tr. 84.)  He had a high school education and was able to communicate in English.  (Tr. 106.)  He held jobs during certain periods both before and after his alleged disability onset date of February 11, 2004, but had no past relevant work.  (Tr. 25, 581.)

**B.    Medical Evidence**

### 1.    Physician and Psychologist Reports

In May 2002, John A. Comley, Psy.D., performed a general psychological assessment on Plaintiff.  (Tr. 188-193.)  At that time, Plaintiff was 18 years old.  (Tr. 188.)  Dr. Comley administered the Wechsler Adult Intelligence Scale – III ("WAIS-III"), which showed that Plaintiff had a Full Scale IQ of 76.  (Tr. 189.)  Results on the Wechsler Memory Scale – III ("WMS-III") suggested a pervasive deficit in overall learning ability with both visual and auditory information, a deficit in the ability to retain information learned through auditory input, and a deficit in the ability to retrieve information from memory after it is learned through auditory input.  (Tr. 190.)  Dr. Comley's assessment found evidence of moderate psychopathology which did not represent any clinically important psychological dysfunction.  (*Id.*)  Dr. Comley diagnosed Plaintiff with Attention Deficit/Hyperactivity Disorder Not Otherwise Specified ("NOS") (hereafter "ADHD") and borderline intellectual functioning.  (Tr. 192.)

On two occasions in March 2004, Ann Leano, M.D., treated Plaintiff on referral from emergency room visits for asthma exacerbations.  (Tr. 254, 370, 428.)  Dr. Leano reported that Plaintiff had a history of lifelong asthma that was poorly controlled due to his smoking.  (Tr. 253.)  She started Plaintiff on an inhaler, prescribed wellbutrin, and

3

instructed him to use a nicotine patch.  (Tr. 254.)  On March 26, 2004, after noting that the wellbutrin and nicotine patches were ineffective, Dr. Leano refilled Plaintiff's prescription for albuterol and started him on doxycycline.  (Tr. 369.)  She encouraged him to stop smoking.  (*Id.*)

On May 26, 2004, James F. Sunbury, Ph.D., ABPP, a psychologist, evaluated Plaintiff at the request of the Bureau of Disability Determination.  (Tr. 260-263.)  Plaintiff reported that he had applied to several jobs but did not think he would be able to hold a job because his temper "always gets him fired."  (Tr. 262.)  Dr. Sunbury diagnosed Plaintiff with Personality Disorder NOS and antisocial features.  (*Id.*)  He rendered the following opinions about Plaintiff: Plaintiff's ability to relate to others is mildly limited due to personality disorder; his ability to understand and follow instructions is probably not limited; his ability to maintain attention to perform simple repetitive tasks is not limited; and his ability to withstand the stress and pressures associated with day-to-day work activity is mildly to moderately limited due to a personality disorder.  (Tr. 263.)

In June 2005, Francine Marie Terry, M.D., M.P.H., completed a physical residual functional capacity assessment.  (Tr. 333-336.)  Dr. Terry reported that Plaintiff's asthma was "currently controlled" and that he needed to quit smoking and using marijuana.  (Tr. 333.)  She noted that Plaintiff's attention deficit disorder was not adequately managed and that he was in need of a neuropsychological evaluation.  (*Id.*)  Dr. Terry also suggested that Plaintiff needed job training.  (*Id.*)  She reported that Plaintiff's ability to pay attention and stay on task was markedly affected, and that he would be "employable" after his ADD is controlled.  (Tr. 334.)

In June 2005, Laurel Smith, Psy.D., examined Plaintiff upon the request of

4

Plaintiff's Social Security counselor.  (Tr. 328-332, 335-336.)  Dr. Smith reported that Plaintiff displayed a persistent pattern of inattention and hyperactive-impulsive behavior which produced significant impairment in social and academic/occupational functioning.  (Tr. 331.)  She did not recommend psychological treatment for Plaintiff, noting that his internal conflicts were not severe enough to require intervention.  (*Id.*)  She suggested that Plaintiff might benefit from neuropsychological therapy and recommended that he receive Vocational Rehabilitation services.  (*Id.*)  Dr. Smith reported that Plaintiff should receive a neurologist/psychiatric evaluation of his condition, and she opined that with regard to his work situation, he is "psychologically disabled" and "unemployable."  (Tr. 331, 336.)

On August 19, 2005, Plaintiff began treating with Kyle Lang, M.D.  (Tr. 368.)  Dr. Lang noted that Plaintiff had a history significant of asthma and attention deficit disorder and continued to prescribe ritalin and albuterol.  (*Id.*)

On September 19, 2005, Plaintiff underwent a mental status assessment.  (Tr. 662-667.)  Plaintiff reported that he was taking care of his children and being responsible and that he would like to be able to deal with his anger and get a job.  (Tr. 665.)  The mental assessment showed that Plaintiff's memory and concentration were impaired, but that his affect was appropriate, and his judgment, intelligence, thought content, mood, and speech were all normal.  (Tr. 664-665.)  The provider's diagnostic impression was cocaine abuse, ADHD by history, adjustment disorder, and rule out cocaine dependency, in early full remission.  (Tr. 666.)

On November 16, 2005, Plaintiff returned to Dr. Lang for a follow-up of allergies and attention deficit disorder.  (Tr. 797-799.)  Dr. Lang's assessment included allergic

5

rhinitis, attention deficit disorder, and asthma.  (Tr. 797-798.)  He reduced Plaintiff's

ritalin and started adderall.  (Tr. 387, 798.)  On December 14, 2005, Plaintiff returned to

Dr. Lang for asthma and attention deficit disorder.  (Tr. 402-403, 420-421.)  Dr. Lang

reported that Plaintiff's attention deficit disorder seemed stable.  (Tr. 402.)  Plaintiff

noted that singulair was working to decrease his use of his albuterol inhaler.  (*Id.*)  He

also reported that he had recently begun working at McDonald's.  (*Id.*)

At his January 2006 assessment with Allison Spencer, M.S.W., Plaintiff reported

an irritable and depressed mood, decreased sleep, and that he had lost custody of his

three-year-old boy after being charged with trafficking in cocaine.  (Tr. 653.)  He

reported feeling "worthless" and unable to find work.  (*Id.*)  His affect was flat and his

memory was impaired, but his concentration and judgment were normal.  (Tr. 655.)  Ms.

Spencer assessed depressive disorder and a Global Assessment of Functioning

("GAF") score of 60, indicative of borderline mild symptoms.[3]  (Tr. 657.)

While incarcerated in early 2006, on intake examination, Cherrill Wertz, M.A.

Ed., assessed cocaine dependence in a controlled setting, depressive disorder, learning

disorder, ADHD, and disruptive behavior by history.  (Tr. 446.)  Plaintiff's GAF was 52.

(*Id.*)  On April 18, 2006, after his release from incarceration, Plaintiff returned to Dr.

Lang for a follow-up for attention deficit disorder.  (Tr. 806-808.)  Plaintiff reported that

he was in a drug treatment center and doing very well.  (Tr. 807.)  He also reported that

he was doing better without adderall and would prefer to stay off of it.  (*Id.*)  The

---

[3]     The GAF scale incorporates an individual's psychological, social, and
occupational functioning on a hypothetical continuum of mental health
illness devised by the American Psychiatric Association.

6

following month, Plaintiff told Dr. Lang that he was doing well on his current medications.  (Tr. 805.)  He still had some anxiety, but it was improving.  (*Id.*)

Plaintiff was incarcerated again from July 2006 until early 2008.  (Tr. 440, 442.)  In July 2006, Ms. Wertz performed a mental status examination, diagnosing cocaine dependence in controlled setting, depressive disorder NOS, and ADHD NOS.  (Tr. 443.)

In late November 2007, Plaintiff underwent a physical and mental examination while incarcerated at Wayne County Jail.  (Tr. 440.)  The physical exam was normal, and the mental exam revealed that Plaintiff's affect was agitated.  (*Id.*)  His speech was clear, his thought process was rational, his thought content was problem-focused, his insight was fair, and he did not report any hallucinations.  (*Id.*)

After his release from incarceration in May 2008, Plaintiff saw Dr. Lang for sore throat, nasal congestion, nasal drainage, and back pain.  (Tr. 822.)  On August 14, 2008, he followed up with Dr. Lang for nausea, vomiting, and wheezing.  (Tr. 819.)  Dr. Lang noted that Plaintiff continued to smoke.  (*Id.*)  Plaintiff was discharged with a trial on nicoderm to assist with smoking cessation.  (Tr. 820.)

On October 6, 2008, Plaintiff reported to the emergency room with complaints of shortness of breath, cough, and chest discomfort.  (Tr. 697-701.)  He reported smoking one-half pack of cigarettes per day.  (Tr. 697.)  The doctor reported that Plaintiff's lungs were clear and diagnosed him with acute exacerbation of asthma.  (*Id.*)  Later that month, Plaintiff returned to Dr. Lang for a follow-up of his anxiety and with complaints of a rash.  (Tr. 815-817.)  Plaintiff indicated that he had not tolerated anti-anxiety or antidepressant medications well.  (Tr. 815.)  Dr. Lang diagnosed him with contact dermatitis and anxiety and indicated that he would set him up with a counseling center

7

for anxiety and depression.  (*Id.*)

On November 6, 2008, Plaintiff underwent a diagnostic assessment with Bruce Sampsel, Ph.D.  (Tr. 637-644.)  Plaintiff reported an inability to read and a history of substance abuse.  (Tr. 638, 640.)  He was oriented, his affect was appropriate, his memory, thought content, mood, speech, and concentration were normal, and his thought flow was unremarkable.  (Tr. 642.)  Dr. Sampsel diagnosed depressive disorder, ADHD by history, and asthma.  (Tr. 643.)

On November 18, 2008, Plaintiff returned to Dr. Lang for his asthma. (Tr. 813-815.)  Plaintiff indicated that his condition had improved with the use of advair, but that he still required daily use of albuterol.  (Tr. 813.)  He complained of an ongoing cough. (*Id.*)  Dr. Lang increased Plaintiff's dosage of advair and encouraged him to stop smoking.  (*Id.*)

At Plaintiff's February 11, 2009, appointment with therapist R. Jacoby, Plaintiff reported that he was abusing substances and had suicidal and homicidal ideation. (Tr. 620.)  He was unemployed and his girlfriend was four months pregnant.  (*Id.*)  The therapist described Plaintiff's level of functioning as poor and noted a diagnosis of major depression.  (*Id.*)  From February through March 2009, Plaintiff attended three counseling sessions focused on addressing his paranoid thoughts and suicidal and homicidal ideation.  (Tr. 630-631, 633.)

When Plaintiff saw Dr. Lang on March 4, 2009, he reported that he was not tolerating Prozac and had stopped taking it.  (Tr. 828.)  He felt paranoid and as if people were "out to get him."  (*Id.*)  Dr. Lang assessed depression and anxiety and continued Plaintiff on Prozac while awaiting a psychiatric recommendation.  (*Id.*)

8

On March 6, 2009, Plaintiff returned for counseling with R. Jacoby.  (Tr. 621.)  He reported extreme, assaultive paranoia, cocaine withdrawal, and an incident of domestic violence.  (*Id.*)  The therapist described Plaintiff's functioning as "extremely poor" and noted that Plaintiff was "in dire need of help."  (*Id.*)  His girlfriend was pregnant and he was facing jail time.  (*Id.*)  A few days later, Plaintiff reported that he felt like hurting himself, but later that day, he denied any suicidal ideation. (Tr. 628-629.)

While incarcerated in April 2009, Plaintiff requested a psychiatric evaluation so that he could obtain medication for schizophrenia.  (Tr. 905.)  He reported that in the past year, he had used marijuana, LSD, crack, heroin, and ecstasy.  (Tr. 907.)  He also reported that he had experienced paranoid delusions and auditory hallucinations when he stopped using heroin in March 2009.  (Tr. 905-906.)  Ms. Wertz assessed polysubstance dependence, depressive disorder, and self-reported schizophrenia, paranoid type.  (Tr. 907.)  She also noted a suspicion that Plaintiff was using a diagnosis of schizophrenia and his symptoms to gain Social Security benefits and also noted that his symptoms may be related to substance abuse.  (Tr. 905.)  On April 16, 2009, Plaintiff told Ms. Wertz that he was "doing all right" and that his paranoia was better because he was in jail and felt safer.  (*Id.*)  He still heard voices but noted that they were not as bad as they had been in the past.  (*Id.*)

In June 2009, Plaintiff saw Dr. Comley for a mental status examination.  (Tr. 889-893.)  Plaintiff reported experiencing a high level of stress, depressive symptoms, generalized behavior problems, difficulties with work, substance abuse, and trouble with the law.  (Tr. 889.)  Dr. Comley noted that Plaintiff behaved appropriately but was also rather fatigued, lethargic, and emotionally distant.  (Tr. 890.)  Dr. Comley's assessment

9

found "evidence of some psychopathology which is chronic and episodic and which currently involved an ongoing episode." (Tr. 892.)  He also noted that Plaintiff was experiencing the effects of his heroin abuse.  (*Id.*)  He diagnosed Plaintiff with ADHD by history and opiod abuse.  (*Id.*)  Dr. Comley recommended psychological treatment in an outpatient setting and noted that Plaintiff should find another job in order to circumvent his deficits.  (*Id.*)

On July 17, 2009, Plaintiff saw Andrew Santora, Ed.D., CNS, APN, for an initial psychiatric evaluation.  (Tr. 618-619.)  Plaintiff reported symptoms of restlessness, racing thoughts, difficulty with concentration and task completion, abrupt mood swings, and paranoia.  (Tr. 618.)  He also noted a history of mood swings and reported that he is highly impulsive and has a moderate degree of aggressiveness and explosive behavior.  (*Id.*)  Dr. Santora assessed major depression, recurrent, severe with psychotic features, ADHD by history, polysubstance abuse in recent remission, rule out impulse control disorder, and rule out psychotic disorder versus substance induced psychotic disorder.  (Tr. 619.)

While incarcerated on August 3, 2009, Plaintiff saw Vicky Pomarico, MA CPC, LPCC, for a mental health examination.  (Tr. 791-92.)  Plaintiff reported auditory hallucinations and noted that he had used crack, heroin, marijuana, and other illegal drugs in the past year.  (Tr. 792.)  Ms. Pomarico assessed schizophrenia, paranoid type, and depressive disorder.  (*Id.*)

On September 25, 2009, Plaintiff returned to Dr. Santora for a follow-up.  (Tr. 606.)  Plaintiff stated that he had experienced increased irritability leading to a physical altercation with his fiancé.  (*Id.*)  A mental status examination indicated major

10

depression, recurrent, with severe psychotic features, ADHD, and polysubstance abuse in recent remission.  (*Id.*)

Plaintiff underwent a mental health and substance abuse screen while in prison on November 5, 2009.  (Tr. 789-790.)  He reported auditory hallucinations and use of marijuana, crack, heroin, and other illegal drugs within the past year.  (Tr. 789.)  Ms. Pomerico diagnosed schizophrenia, paranoid type and depressive disorder NOS.  (*Id.*)

Plaintiff returned to Dr. Santora on November 23, 2009.  (Tr. 685.)  Plaintiff reported that his mood was increasingly depressed and denied suicidal ideation.  (*Id.*)  He noted increased restlessness, irritability, and insomnia.  (*Id.*)  On mental status examination, Plaintiff's thought process was logical, he denied any psychotic features, his memory and concentration appeared to be in tact, and his insight and judgment were rated as fair in a controlled environment.  (*Id.*)  Dr. Santora diagnosed major depression, recurrent, severe with psychotic features, ADHD, and polysubstance abuse in remission in controlled environment.  (*Id.*)  Plaintiff returned to Dr. Santora in December 2009 and January 2010, reporting that his medications were improving his anxiety and reducing his mood variability but causing depression.  (Tr. 678, 680.)

On March 5, 2010, Plaintiff saw Theresa K. Malmon Berg, CNP, for an evaluation of his psychological medications.  (Tr. 852.)  Plaintiff reported that Seroquel and Trazodone were not helping.  (*Id.*)  He stated that he had begun working second shift (4:30 p.m. – 1:00 a.m.) for the last two weeks and felt very "zombified."  (*Id.*)  He reported hearing voices a couple times per month, mostly when he had stopped taking Seroquel.  (*Id.*)  He stated that he was living with his grandparents and just started working.  (Tr. 853.)

11

Plaintiff saw Aly Zewail, M.D., on March 10, 2010.  (Tr. 671.)  Although Plaintiff reported that he had not been sleeping well, he was in a good mood and had no suicidal or homicidal ideation.  (*Id.*)  He reported having a lot of anxiety dealing with people. (*Id.*) His physical examination was normal and his asthma was controlled.  (*Id.*)  Plaintiff returned to Dr. Zewail on March 17, 2010.  (Tr. 670, 881.)  He reported that his medications were helping his mood.  (Tr. 881.)  Dr. Zewail diagnosed asthmatic bronchitis, sinusitis, bipolar disorder, and anxiety.  (*Id.*)  On June 15, 2010, Dr. Zewail described Plaintiff's asthma as "controlled" and prescribed a proair inhaler.  (Tr. 880.)

In August 2010, Plaintiff returned to Dr. Zewail with complaints of back pain. (Tr. 878.)  Dr. Zewail assessed low back pain, asthma, attention deficit disorder with hyperactivity, and schizophrenia.  (*Id.*)  He noted that Plaintiff needed to go to psychiatry to be evaluated for SSI.  (*Id.*)

On September 2, 2010, Dr. Zewail completed a physical residual functional capacity questionnaire.  (Tr. 869-871.)  Dr. Zewail opined that Plaintiff could lift and carry twenty pounds occasionally and twenty-five pounds frequently.  (Tr. 869.)  He noted that Plaintiff could stand and walk for about two hours during an eight-hour workday, with sitting likewise limited to about two hours.  (*Id.*)  According to Dr. Zewail, Plaintiff could sit or stand for sixty minutes before needing to change position and must walk around every twenty minutes for twenty to sixty minutes at a time.  (Tr. 869-870.)  Dr. Zewail noted that Plaintiff would need the opportunity to shift at will from sitting or standing/walking, but that he would not need to lie down at unpredictable intervals during a work shift.  (Tr. 870.)  Dr. Zewail opined that Plaintiff could frequently twist and climb stairs and occasionally stoop, bend, and climb ladders, and that his ability to

12

reach overhead may be affected.  (*Id.*)  He reported that Plaintiff must avoid concentrated exposure to extreme cold and heat, high humidity, fumes, odors, dusts, gases, perfumes, solvents, and cleaners.  (Tr. 871.)

On April 14, 2011, Plaintiff was released from incarceration, and a medical summary was completed.  (Tr. 894-895.)  The summary indicated a need for mental health and asthma follow-up treatment and diagnosed psychotic disorder NOS and social phobia.  (*Id.*)

On April 5, 2012, Plaintiff saw James E. Kennedy, LISW-S, for a diagnostic assessment.  (Tr. 928-938.)  Plaintiff reported being released from prison after serving 18 months for domestic violence.  (Tr. 929.)  He indicated that his medications were helping with his concentration and that he was seeking employment.  (*Id.*)  He reported smoking one pack of cigarettes per day and having a history of illegal drug use.  (Tr. 930.)  Mr. Kennedy found Plaintiff was engaged with his family, had at least one close friend, did something outside of his home at least once a week, and had at least one hobby or personal interest.  (Tr. 931.)  He did not find that Plaintiff had any limitations in activities of daily living.  (Tr. 932.)  He noted that Plaintiff had adequate general health, an ability to follow-through on recommendations, an ability to recognize and report symptom changes, and motivation to improve.  (*Id.*)  Mr. Kennedy also reported that Plaintiff presented with low intelligence and that he had poor impulse control, impaired judgment, poor frustration tolerance, memory problems, depression, and anxiousness.  (Tr. 934.)  Mr. Kennedy diagnosed Plaintiff with depressive disorder NOS.  (Tr. 936.)

On April 18, 2012, Plaintiff saw Mr. Kennedy for a crisis management session.  (Tr. 927.)  Plaintiff reported submitting a job application and indicated that he was doing

13

better but felt he would have better results on medication.  (*Id.*)  According to Mr. Kennedy, Plaintiff was cooperative and willing to follow a treatment plan.  (*Id.*)

On April 23, 2012, Plaintiff saw Vera Astreika, M.D., for a psychiatric evaluation.  (Tr. 924-926.)  Plaintiff reported that he had been sober since going to prison, but that he periodically hears a male voice telling him to take drugs.  (Tr. 924.)  Dr. Astreika assessed major depressive disorder with psychotic features, a history of ADHD, and recovering opioid dependence.  (Tr. 926.)  At a crisis management session on April 27, 2012, Plaintiff reported feeling much better and looking forward to a  future psychiatric evaluation.  (Tr. 923.)  The clinician reported that Plaintiff appeared to have only mild anxiety and depression.  (*Id.*)

### 2.        Agency Reports and Assessments

On June 10, 2004, state reviewing physician Donna E. Winter, Ph.D., completed a psychiatric review of Plaintiff.  (Tr. 299-311.)  Dr. Winter opined that Plaintiff had borderline intellectual functioning and personality disorder, which did not satisfy diagnostic criteria.  (Tr. 303, 306.)  She found that Plaintiff was mildly restricted in activities of daily living and that he had mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration.  (Tr. 309.)   Dr. Winter opined that Plaintiff had a mental residual functional capacity moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximately to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

14

without an unreasonable number and length of rest periods.  (Tr. 312-313.)

On June 11, 2004, state reviewing physician Anton Freihofner, M.D., completed a physical residual functional capacity assessment, finding Plaintiff limited only by the need to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, gases, and poor ventilation.  (Tr. 318.)  State reviewing physician Eli N. Perencevich, D.O., affirmed Dr. Freihofner's opinion.  (Tr. 319.)

On August 2, 2005, state reviewing psychologist Kristen E. Haskins, Psy.D., found that Plaintiff had ADHD and borderline intellectual functioning that did not satisfy the diagnostic criteria. (Tr. 340, 343.)  She reported that Plaintiff had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration.  (Tr. 349.)  She opined that Plaintiff retained the residual functional capacity to understand, remember, and carry out simple task instructions, that he would do best in an environment with demonstrated instruction, and that he was able to get along with co-workers and supervisors at least on a superficial level.  (Tr. 355.)

On August 2, 2005, state reviewing physician E.S. Villanueva, M.D., reported that Plaintiff would have to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 361.)  Dr. Villanueva noted that Plaintiff's ADHD was not disabling.  (*Id.*)

C.    **Hearing Testimony**

    1.    **Plaintiff's Testimony**

 After the Appeals Council granted review of the ALJ's first decision denying

15

Plaintiff's application for SSI, Plaintiff testified at a second video hearing on September 10, 2010.  (Tr. 951-922.)  He testified as follows:

Plaintiff took special education classes throughout high school due to his ADHD. (Tr. 957.)  He could read and write the English language "a little bit;" he could not read the newspaper but could read a simple grocery list.  (Tr. 958.)  He could do basic math, but could not handle his own checkbook or expenses. (*Id.*)

Plaintiff had 17 different job attempts, none of them lasting six months or more. He had been fired from every job.  (Tr. 959.)  He often did not show up for work and did not understand written directions.  (*Id.*)  Plaintiff cited his poor attendance and "mental problem" as reasons his former employers fired him.  (Tr. 960.)

Plaintiff received mental health counseling, where he talked to counselors about anger management.  (Tr. 961.)  He also took several medications that helped "sometimes" but not all the time.  (*Id.*)  Plaintiff's problems with concentration kept him from working.  (*Id.*)  Specifically, he often dozed off and could not pay attention or understand what his supervisors were talking about.  (*Id.*)  Plaintiff also had issues with psychotic features which caused him to hear voices or have paranoid thoughts.  (*Id.*) He took medication which eased, but did not eliminate, his paranoia.  (*Id.*)

At the time of the hearing, Plaintiff lived with his girlfriend and grandmother most of the time.  (Tr. 962.)  He testified that he "can't trust nobody really" but that he could trust his girlfriend and grandmother "sometimes."  (*Id.*)  Plaintiff spent about six hours per day in bed.  (*Id.*)  He left the house for a couple hours per day to take a walk around the block by himself.  (Tr. 962-963.)  He did not visit with friends or family outside of his home except for his father, who lived a couple miles away.  (Tr. 963.)  Plaintiff spent

about an hour per day watching TV or playing video games.  (*Id.*)  He could not spend

longer than an hour at those activities, because he could not sit still.  (*Id.*)

Plaintiff met his girlfriend at a drug and alcohol class that he was required to

attend because of his addictions.  (Tr. 964.)  He attended the class three days a week

for four hours each day for a total of one year.  (Tr. 964-965.)  After being sober for

three years, Plaintiff relapsed on drugs on Christmas of 2008, and became sober again

in October 2009.  (Tr. 965.)  Plaintiff had follow-ups with his counseling center once a

month.  (*Id.*)  When he called, the center would schedule an appointment for him.  (*Id.*)

Plaintiff often missed his appointments because he had no transportation.  (Tr. 965-

966.)

Plaintiff had problems with anger management.  (Tr. 966.)  "I just get angry all the

time, I mean, it could be a good day and something would make me mad out of the

blue."  (*Id.*)  When he became angry, he would yell and start breaking things.  (*Id.*)

These outbursts occurred about three times per month and were directed at anyone

who was around him at the time.  (*Id.*)

Plaintiff suffered from asthma.  (Tr. 967.)  He treated with an albuterol inhaler,

which he used a couple times per month.  (*Id.*)  His only present symptom related to his

asthma was a tight chest, which occurred weekly and usually in the morning.  (Tr. 967-

968.)  Plaintiff smoked cigarettes regularly.  (Tr. 971.)  He testified that he was currently

down to three cigarettes per day.  (*Id.*)  Plaintiff also had lower back pain, which affected

him all of the time.  (Tr. 968.)  Because of his back pain, he could only lift up to 25

pounds and could only stand for a couple hours and walk for "maybe an hour."  (*Id.*)  He

could sit or lay without problems.  (*Id.*)

17

When Plaintiff worked in a rubber factory, he was responsible for sorting different colored rubber weighing a couple pounds.  (Tr. 969.)  He also worked as a wood pallet assembler, where he had to cut wood to size.  (*Id.*)  Plaintiff worked as a pressure car washer in 2004, but was fired after having an asthma attack on the job.  (*Id.*)

Plaintiff had three children from three different mothers. (Tr. 970.)   He did not have custody of any of his children and did not get to spend any time with them, whether alone or supervised.  (*Id.*)  At the time of the hearing, Plaintiff testified that he was nine months sober.  (Tr. 972.)

Plaintiff testified briefly at his third hearing on July 22, 2011.  (Tr. 965-966.)  At the time of the hearing, he was incarcerated for violating probation by driving under suspension and did not expect to be released until February 14, 2012.  (Tr. 995.)  He was located in the general population and did not have any specific accommodations within that population.  (*Id.*)  In prison, he was assigned to Food Work Service, where he mopped floors for about two hours per day.  (Tr. 996.)  He was also attending drug and alcohol classes one day a week for three hours per day.  (*Id.*)  He was not participating in any recreational activities or working out in the gym.  (*Id.*)

### 2.      ME Testimony

At Plaintiff's second administrative hearing on September 10, 2010, Dr. Gerald P. Koocher, a medical expert, testified from his office in Boston.  (Tr. 972-985.)

After reviewing the medical data the ME found that there was sufficient, objective medical evidence in the record to allow him to form an opinion about Plaintiff's medical status.  (Tr. 974.)  The ME noted that the record posed a challenge in interpreting it, because

18

> [t]here are points in time where the claimant has clearly impressed people as being severely impaired.  And there are co-existing evidences in the record at various points in time where the claimant was able to present himself in a relatively benign or moderate to mild level of impairment, and that's the heart of the matter in terms of reaching a conclusion of level of severity.

(Tr. 976.)  The ME described Plaintiff as a "very troubled" individual with serious depression and, at times, a thought disorder.  (Tr. 977.)  The ME testified that Plaintiff's thought disorder will be worse when he is not taking his medication and when he uses any substances, such as marijuana, alcohol, or cocaine that might loosen the controls he has on his behavior and cause him to act out.  (*Id.*)  According to the ME, Plaintiff's emotional coping abilities are "somewhat fragile" and contingent on him following a treatment regimen, taking his medication, and being able to control his behavior.  (*Id.*)

The ME opined that when Plaintiff is adequately medicated for his psychiatric conditions and abstinent from illegal drugs, the equivalence of his listing would probably be "moderately impaired."  (Tr. 980.)  However, if he stopped taking his medication or engaged in substance abuse, it would "very quickly go downhill."  (*Id.*)

The ME had two primary concerns regarding Plaintiff's ability to function in the workplace.  (*Id.*)  First, Plaintiff would have issues dealing with the public and would not be suited for work as a customer service representative.  (*Id.*)  Second, Plaintiff's ADHD and potential intrusive thoughts associated with psychosis would interfere with his ability to follow instructions and might lead him to become confused.  (*Id.*)  Tasks that are not simple, repetitive, and clear-cut could pose a problem for Plaintiff, and he would have some difficulty dealing with authority figures.  (*Id.*)  The ME opined that "if there were jobs that were somewhat away from the public that were highly routine in nature in a

19

work setting that was willing to tolerate people with a degree of emotional variability and impairment," those settings might be suitable for Plaintiff when he's taking his medication.  (Tr. 981.)  The ME stated that he did not believe Plaintiff would require a sheltered workshop.  (Tr. 985.)

An ME did not testify at Plaintiff's third administrative hearing.

### 3.     VE Testimony

At Plaintiff's third administrative hearing on July 22, 2011, Kerry Skilin, a vocational expert, testified.[4]  (Tr. 997-1003.)  The ALJ asked the VE to assume a hypothetical individual with no literacy, who has a work history where he has not obtained substantial gainful activity.  (Tr. 997-998.)  At almost 28 years old, the individual has had 15 failed work attempts, half of which he was fired from.  (Tr. 998.) The VE testified that illiteracy would not be an issue for unskilled jobs that do not require reading or writing, as she has evaluated individuals who cannot speak English but are capable of doing such jobs as assemblers, inspectors, or packers where there is no reading or writing requirement.  (*Id.*)  The VE further opined that the failed work attempts, if they were a result of psychological issues or failure to get along with coworkers or supervisors, would have a larger impact on the hypothetical individual's ability to work.  (Tr. 999.)  The VE stated that an individual with such issues who is not able to maintain employment might have the opportunity to have a job coach on the job site through the individual's transitional phase to ensure that his needs are met.  (*Id.*)

---

[4]     Kerry Skilin had also testified at Plaintiff's second administrative hearing on September 10, 2010.  (Tr. 988-991.)

The coach would be someone who would help the individual feel more comfortable and help him achieve the ultimate goal of competitive employment.  (*Id.*)

The ALJ then asked the VE to consider the same hypothetical individual as described above, but add that the individual has borderline intellectual functioning with scores in the low 70s, an inability to interact with the general public, and only superficial, limited contact with coworkers or supervisors.  (Tr. 1000.)  The VE opined that there would be simple, unskilled, routine, repetitive jobs that such a person could perform.  (*Id.*)  The VE testified that she has evaluated people with similarly low IQ's and that they have performed such work in the past.  (*Id.*)  She reiterated that the real issue is the failed work attempts.  (Tr. 1000-1001.)

The ALJ asked the VE to consider a third hypothetical, which assumed an individual with all of the characteristics described in the first two hypotheticals, adding that the individual was markedly limited in his ability to stay on task, meaning that he would be off task 25 to 30 percent of the time.  (Tr. 1001.)  The VE opined that if the person was off task 25 to 30 percent of the workday, that would preclude full-time sustained employment.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since June 9,

2005, the application date.

2.    The claimant has the following severe impairments: asthma; allergic rhinitis; depressive and anxiety disorders; history of polysubstance abuse.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart A, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he cannot tolerate concentrated exposure to dust, fumes, strong odors, temperature or humidity extremes; he is limited to simple, rote tasks, in jobs capable of being taught by demonstration, and not requiring reading; he is limited to work which requires no more than occasional interaction with co-workers and supervisors and none with the public.

5.    The claimant has no past relevant work.

6.    The claimant was born on August 7, 1983, and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.    The claimant has at least a high school education and is able to communicate in English.

. . . . .

9.    Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 9, 2005, the date the application was filed.

(Tr. 19-27.)

## LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made

23

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignment of Error**

Plaintiff's sole assignment of error takes issue with the ALJ's assessment of medical source opinions in the record.  Specifically, Plaintiff argues that the ALJ did not properly consider the opinions of Aly Zewail, M.D., James Sunbury, Ph.D., Laurel Smith, Psy.D., Francine Marie Terry, M.D., and Kristen E. Haskins, Psy.D.  Plaintiff seeks reversal of the ALJ's decision on the basis that the ALJ's determination lacks substantial

24

evidence, was not based on proper legal criteria, and is contrary to the Appeals Council order of remand. In the alternative, Plaintiff requests this Court to remand his case so that the ALJ may properly evaluate Plaintiff's disability claim, considering all the evidence of record. The Commissioner responds that substantial evidence in the record supports the ALJ's decision.

### 1. Opinion of Dr. Zewail

Plaintiff argues that the ALJ failed to properly analyze the opinion of Aly Zewail, M.D., as that opinion relates to Plaintiff's physical limitations. In relevant part, Dr. Zewail opined that Plaintiff could stand and walk for about two hours during an eight-hour workday, with sitting likewise limited to two hours. (Tr. 869.) Plaintiff could sit or stand for about 60 minutes before needing to change position and would need to walk around every 20 minutes for about 20 to 60 minutes at a time. (Tr. 870.) Plaintiff would need the opportunity to shift at will from sitting or standing/walking. (*Id.*) Additionally, Dr. Zewail found that Plaintiff could twist and climb stairs frequently, and that he could stoop, bend, crouch, and climb ladders occasionally. (*Id.*) Moreover, Dr. Zewail regularly indicated asthma as a diagnosis in Plaintiff's records and assessed lower back pain on more than one occasion. (Tr. 670, 874, 877, 880-881.) Dr. Zewail noted that Plaintiff must avoid concentrated exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, perfumes, and solvents or cleaners. (Tr. 871.)

The ALJ specifically refers to Dr. Zewail as a "treating source."[5] (Tr. 24.) "An

---

[5] In his decision, the ALJ does not refer to Dr. Zewail by name. Rather, he calls attention to Dr. Zewail's opinion by referencing "[t]he treating source medical opinion relative to the claimant's mental health status at Exhibit 36F . . . ." (Tr. 24.) Exhibit B-37 F of the Transcript of Proceedings refers

ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, although the ALJ considered Dr. Zewail a treating source, he did not give Dr. Zewail's opinion controlling weight.  (Tr. 24.)  Rather, the ALJ stated that he did not give "significant probative weight" to Dr. Zewail's opinion relative to Plaintiff's *mental* limitations, and that he found Dr. Zewail's opinion relative to Plaintiff's *physical* limitations to be "totally unsupported by the longitudinal history."  (*Id.*)  Plaintiff's argument that the ALJ failed to indicate the weight given to the opinion of Dr. Zewail as

---

to Plaintiff's medical records covering the period from 12/15/09 to 9/2/10 from Aly Zewail, M.D.

26

it relates to Plaintiff's physical limitations is not well taken.  The ALJ's statement that "the opinion relative to the claimant's physical limitations is totally unsupported by the longitudinal history" shows that the ALJ generally considered Dr. Zewail's opinion, but ultimately rejected it due to its inconsistency with the record.  (Tr. 24.)

While the ALJ clearly rejects Dr. Zewail's opinion regarding Plaintiff's physical limitations, he fails to adequately explain his reasons for doing so.  According to the ALJ, Dr. Zewail's opinion is "totally unsupported" by Plaintiff's medical history, because "the only indication of physical maladies in the record are a history of asthma, and a period of pelvic and testicular pain, resolved via varicocelectomy."[6]  (Tr. 24.)  The ALJ further states that any suggestion that such maladies would impose severe limitations on a continuous basis for twelve consecutive months "insults the intelligence and assaults the credulity of this ALJ."  (*Id.*)  While it certainly seems unlikely that a history of asthma and a period of pelvic and testicular pain could render significant functional limitations, the ALJ's brief and conclusory statements of disdain for Dr. Zewail's opinion are not sufficiently detailed to allow this Court to determine why the ALJ assigned less than controlling weight to a treating source's opinion and do not detail the medical evidence upon which the ALJ relied to discount the limitations suggested by Dr. Zewail. The ALJ does not state whether he has accounted for Plaintiff's complaints of lower back pain and fails to indicate which factors, if any, he considered in rejecting Dr.

_____

[6]     Plaintiff notes that the ALJ's failure to mention Plaintiff's allergic rhinitis when discussing Plaintiff's physical maladies is inconsistent with the medical evidence of record and the ALJ's own findings; however, the ALJ's omission of allergic rhinitis is of no consequence, as the ALJ includes allergic rhinitis as one of Plaintiff's severe impairments and accounts for it in his RFC.  (Pl. Br. at 21; Tr. 20, 22.)

27

Zewail's opinion.  The ALJ does not explain whether he found *all* of Dr. Zewail's findings – including his assessment of Plaintiff's lower back pain – to be inconsistent with the longitudinal history, or whether he based his decision to reject Dr. Zewail's opinion solely on Plaintiff's asthma and pelvic and testicular pain.  Because the ALJ's only stated reason for rejecting Dr. Zewail's opinion is that it is "totally unsupported" and a "disingenuous attempt" to accommodate Plaintiff's application, the ALJ's opinion does not supply sufficient information necessary for meaningful review.

The ALJ's broad statement that Dr. Zewail's opinion is "totally unsupported by the longitudinal history" does not amount to giving "good reasons" for rejecting the opinion of Dr. Zewail, a treating source.  *See Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement).  The ALJ fails to identify the record evidence that contradicts the opinion of Dr. Zewail or describe how his opinion lacks support in, or is inconsistent with, the record as a whole.  *See, e.g., Friend v. Comm'r of Soc. Sec.,* *375 F. App'x 543, 552 (6th Cir. 2010)* ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").  Further, this is not a case in which the ALJ's discussion of other medical opinions in the record provides a clear basis for rejecting the treating physician's opinion.  *See, e.g., Nelson v. Comm'r of Soc.* *Sec.,* 195 F. App'x 462, 470-71 (6th Cir. 2006)* (finding that the ALJ's discussion of other medical evidence and opinions made it clear that the opinions of the claimant's treating physicians were inconsistent with the record evidence as a whole and, thus,

28

"implicitly provided" sufficient reasons for rejecting their opinions).  Rather, the ALJ's

discussion of other medical opinions in the record relative to Plaintiff's physical

limitations is similarly brief and conclusory.[7]  Accordingly, the ALJ's unsatisfactory

explanation for rejecting the opinion of Dr. Zewail as it relates to Plaintiff's physical

limitations frustrates the dual purposes of the "good reason" requirement: It neither

sufficiently describes to Plaintiff the basis for the ALJ's conclusions, nor provides this

Court with adequate material for meaningful review.

Further, when noting his rejection of Dr. Zewail's opinion relative to Plaintiff's

physical limitations, the ALJ does not indicate whether he is referring to Dr. Zewail's

opinion of Plaintiff's asthma and allergic rhinitis (Tr. 670-671, 880-881), his opinion

regarding Plaintiff's lower back pain (Tr. 874-878), his opinion regarding Plaintiff's ability

to sit, stand, and walk in an eight-hour workday (Tr. 870-871, 872-876, 910-914), or all

opinions.

_____

[7]     The ALJ cites to records demonstrating Plaintiff's history of asthma and
chronic rhinitis.  (Tr. 22.)  He notes that Plaintiff's asthma "generally is
controlled by the use of an inhaler."  (*Id.*)  Other than his brief discussion
of Plaintiff's asthma and his vehement rejection of Dr. Zewail's opinion, the
ALJ does not specifically address any additional medical opinions relative
to Plaintiff's physical complaints.  At the outset of his discussion of
Plaintiff's residual functional capacity, the ALJ notes that he "has
considered all symptoms and the extent to which these symptoms can
reasonably be accepted as consistent with the objective medical evidence
and other evidence" and that he has considered "opinion evidence in
accordance with the requirements of 20 CFR 416.929 and SSRs 96-4p
and 96-7p.  The undersigned has also considered opinion evidence in
accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p,
96-5p, 96-6p and 06-3p."  (Tr. 22.)  These blanket statements of
compliance with the regulations, without more, do not provide this Court
with a basis for finding that the ALJ's discussion of other medical opinions
in the record provides a clear basis for rejecting Dr. Zewail's opinion.

The Commissioner is correct in noting that, in his Brief, Plaintiff does not identify a physical impairment that would support Dr. Zewail's limitations in Plaintiff's ability to stand, walk, and sit.  (Pl. Br. at 20-22.)  Moreover, the Commissioner makes a strong argument that the record shows, consistent with the ALJ's decision, that Plaintiff's physical impairments were minimal.  Indeed, evidence was available on which the ALJ could have relied to justify giving less than compelling weight to those opinions by Dr. Zewail that were based on Plaintiff's functional capacity evaluation.[8]  The ALJ, however, did not identify or discuss sufficient evidence in the record to support his decision to reject Dr. Zewail's opinion.  "[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Berryhill v. Shalala,* 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993)* (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983)* (citation omitted)).

Because the ALJ failed to adequately explain why he rejected Dr. Zewail's opinion, the ALJ's decision is not supported by substantial evidence.  For this reason, it is recommended that this case be remanded to the ALJ for a more careful examination of Dr. Zewail's opinion relative to Plaintiff's physical limitations, and, if the ALJ declines to assign him controlling weight, a complete explanation of why he reached that conclusion.

## 2.  Opinions of Drs. Sunbury, Smith, Terry, and Haskins

---

[8]     Notably, Plaintiff had several normal physical examinations (Tr. 369, 402, 430, 797, 807, 822), and he reported that he could walk one-half mile and that his asthma was controlled with medication.  (Tr. 961, 971.)

Plaintiff argues that the ALJ failed to properly evaluate the opinions of Dr. Sunbury, Dr. Smith, Dr. Terry, and Dr. Haskins.  Plaintiff takes issue with the ALJ's analysis of these medical sources, as follows:

- Dr. Sunbury:  The extent to which the ALJ analyzed Dr. Sunbury's opinion was limited to a one-sentence summary in the ALJ's decision.  (Tr. 23.) The ALJ noted that Dr. Sunbury "found only mild occupational impairment with restriction to simple, unskilled work," when in fact Dr. Sunbury noted that Plaintiff was "mildly to moderately" limited in his ability to withstand the stress and pressures of day to day work activity.  (Tr. 23, 263.) Despite specific instruction from the Appeals Council to provide an appropriate rationale in his decision and explain what weight he accorded to Dr. Sunbury's opinion, the ALJ failed to do either.  (Tr. 465.)

- Dr. Smith: Dr. Smith opined that Plaintiff had an extreme limitation in his ability to maintain attention and concentration for extended periods and marked limitations in his ability to understand, remember, and carry out detailed instructions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to get along with coworkers and peers without distracting them or exhibiting behavior extremes, and to set realistic goals or make plans independently of others. (Tr. 331.)  She further noted that Plaintiff is "psychologically disabled" and "unemployable."  (Tr. 331, 336.)  The extent to which the ALJ analyzed this opinion is limited to a one-sentence summary in his decision, and despite specific instruction from the Appeals Council to provide an appropriate rationale in his decision and explain what weight he accorded to Dr. Smith's opinion, the ALJ failed to do either. (Tr. 465.)

- Dr. Terry: Dr. Terry completed a physical residual functional capacity assessment, finding no limitations related to physical impairments, but noting that Plaintiff's attention and ability to stay on task were markedly affected. (Tr. 334.)  She opined that Plaintiff would be employable after his attention deficit disorder was controlled. (*Id.*)  Despite specific instruction from the Appeals Council to provide a rationale in his decision and explain what weight he accorded Dr. Terry's opinion, the ALJ failed to address Dr. Terry's opinion altogether.

- Dr. Haskins: State reviewing physician Dr. Haskins indicated Plaintiff had marked difficulties in maintaining concentration, persistence, or pace. (Tr. 353.)  She opined that Plaintiff retained the residual functional capacity to understand, remember, and carry out simple task instructions, would

do best in an environment with demonstrated instructions, and could get along with co-workers and supervisors at least on a superficial level.  (Tr. 355.)  The ALJ discussed Dr. Haskins' opinion only in reference to  the VE, who testified that the limitations described by Dr. Haskins would be work preclusive.  (Tr. 24, 1001.)  The ALJ did not give the VE's testimony significant weight, because "it is beyond the ken of the vocational expert to relate a 'marked' restriction to specific work limitation." (Tr. 24.)  Any analysis of Dr. Haskins' opinion is not obvious and does not avail itself to meaningful review.

For the following reasons, Plaintiff's arguments are not well taken.[9]

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts the ALJ's RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue,* 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, Plaintiff's argument as to Dr. Sunbury is without merit.  Plaintiff contends

---

[9]     The ALJ did not find, nor does Plaintiff contend, that the aforementioned professionals are treating sources.  Thus, the analysis of whether the ALJ properly considered their opinions differs from the previous discussion of Dr. Zewail's opinion.

that the ALJ inaccurately summarizes the findings of Dr. Sunbury, because the ALJ notes that Dr. Sunbury "found only mild occupational impairment with restriction to simple, unskilled work," when Dr. Sunbury actually found Plaintiff "mildly to moderately" limited in his ability to withstand the stress and pressures of day-to-day work activity. (Tr. 23, 263.)  However, Plaintiff does not address how the ALJ's description of one limitation as "mild" rather than "mild to moderate" is error, or how that error caused harm.  In fact, Dr. Sunbury's opinion is actually consistent with the ALJ's RFC.  Dr. Sunbury found that Plaintiff's ability to relate to others is mildly limited, and his ability to understand and follow instructions and maintain attention to perform simple repetitive tasks is not limited.  (Tr. 263.)  In accordance with these findings, the ALJ limited Plaintiff to only occasional interactions with co-workers and supervisors and none with the public.  (Tr. 22.)  Thus, because Dr. Sunbury's opinion is consistent with the ALJ's RFC, the ALJ's failure to assign weight to the opinion or discuss it in depth does not constitute reversible error.

Plaintiff's argument as to state agency psychologist Dr. Haskins also lacks merit.  Plaintiff argues that the ALJ erred in failing to account for Dr. Haskins' opinion that Plaintiff had marked difficulties in maintaining concentration, persistence, or pace. (Tr. 349.)  However, the ALJ's decision and the record as a whole indicate why the ALJ's RFC does not account for this limitation. (Tr. 23.)  Most notably, the ALJ relies on Plaintiff's acknowledgment at his first hearing that, when medications are available and he is compliant with them, he can stay focused and work, as long as not pestered by supervisors with other tasks.  (*Id*.)  Thus, the ALJ's RFC is consistent with Plaintiff's own testimony, as it limits his interaction with supervisors, in turn allowing him to stay

33

focused and on task.  (Tr. 22.)

Furthermore, to the extent that Plaintiff challenges the ALJ's decision with

respect to Dr. Haskins' findings of marked restrictions in her mental RFC assessment,

Plaintiff's argument is not well taken.  It was in Section I of Dr. Haskins' RFC

assessment that she found Plaintiff markedly limited in his ability to carry out,

understand, and remember detailed instructions. (Tr. 353-354.)  The agency's Program

Operations Manual System ("POMS"), the operational reference used by agency staff to

conduct the agency's daily business, provides that "Section I is merely a worksheet to

aid in deciding the presence and degree of functional limitations and the adequacy of

documentation and does not constitute the RFC assessment."  POMS DI

24510.060(B)(2)(a).[10]  Rather, Section III "is for recording the mental RFC

determination.  It is in this section that the actual mental RFC assessment is recorded."

POMS DI 24510.060(B)(4)(a).  "While these administrative interpretations [POMS] are

not products of formal rulemaking, they nevertheless warrant respect . . . " *Washington

Dep't of Soc. Servs. v. Keffeler,* 537 U.S. 371, 385 (2003).  This Court has

acknowledged that "Section I of the mental assessment is merely a worksheet that does

not constitute the RFC assessment."  *Coleman v. Astrue,* No. 3:10-cv-464, 2010 WL

4955718, *7 (N.D. Ohio Nov. 18, 2010)* (White, Mag. J.); *see also Velez v. Comm'r of

Soc. Sec.,* NO. 1:09-cv-715, 2010 WL 1487599, *6 (N.D. Ohio Mar. 26, 2010)* (Gallas,

M.J.) ("In general . . . the ALJ is not required to include the findings in Section I in

---

[10]   The POMS is available at:
https://secure.ssa.gov/apps10/poms.nsf/Home?readform (last visited Aug.
30, 2013).

formulating residual functional capacity."). In Section III of her August 2005 mental RFC assessment, Dr. Haskins concluded that Plaintiff "can understand, remember, and carry out simple task instructions. He may do best in an environment with demonstrated instructions. He is able to get along with co-workers and supervisors at least on a superficial level." (Tr. 355.) The ALJ accounts for these findings in his calculation of Plaintiff's RFC.[11] Accordingly, Dr. Haskins' opinion regarding Plaintiff's mental RFC does not contradict the ALJ's determination of Plaintiff's RFC and, thus, the ALJ's failure to discuss her opinion is not error.

Plaintiff's arguments as to Drs. Smith and Terry are also without merit. On June 9, 2005, Dr. Smith noted that Plaintiff had an extreme limitation in his ability to maintain attention and concentration for extended periods and marked limitations in his ability to understand, remember, and carry out detailed instructions, complete a normal workweek without interruptions from psychologically based symptoms, and get along with coworkers or peers. (Tr. 328-332, 335-336.) On that same day, Dr. Terry opined that Plaintiff's ability to pay attention and stay on task was markedly affected. (Tr. 334.) Dr. Terry noted that Plaintiff would be "employable" after his ADD was controlled. (*Id.*)

The ALJ's failure to analyze Dr. Terry's opinion is not error, because the ALJ's RFC is not inconsistent with Dr. Terry's findings. In January 2006, Plaintiff's concentration and judgment were normal. (Tr. 655.) In April 2006, Plaintiff reported that he was "doing better" without Adderall. (Tr. 807.) In September, November, and

---

[11]     The ALJ limited Plaintiff to "simple, rote tasks, in jobs capable of being taught by demonstration, and not requiring reading" and "no more than occasional interaction with co-workers and supervisors." (Tr. 22.)

December 2009, Plaintiff's memory and concentration appeared to be in tact. (Tr. 606, 680, 685.) The ALJ noted that from November 2009 through March 2010, Plaintiff's mental status examinations were benign, and in June 2010, his mental status remained benign and his memory and judgment appeared to be in tact. (Tr. 23, 673-685, 838.) The ALJ also discussed Plaintiff's first hearing testimony acknowledging his ability to stay focused and work when he complies with his medications. (Tr. 23.) Accordingly, the ALJ's RFC is not inconsistent with Dr. Terry's opinion, because substantial evidence shows that Plaintiff's ADD has become controlled since Dr. Terry's 2005 assessment. As a result, the ALJ's failure to address Dr. Terry's report or include her findings in the RFC does not constitute error.

Furthermore, the ALJ did not error with regard to Dr. Smith's opinion. Plaintiff argues that it is unclear whether the ALJ rejected Dr. Smith's findings or failed to evaluate them altogether. However, the ALJ does address Dr. Smith's opinion, noting that she "found a more severe GAF of 45, and more limiting occupational constraints [Exhibit 14F]." (Tr. 23.) The ALJ then addresses how Dr. Smith's opinion differs from Plaintiff's mental state while he was incarcerated :

> [I]n a controlled environment, with treatment available and away from drug availability, the claimant had a starting GAF of 52, and a later GAF of 59 [Exhibit 27-F-11, 8]. This is a solid indication of the effect of substance abuse, though the medical expert did not feel there were sufficient periods of sobriety to separate out the claimant's mental impairment with or without the impact of substance abuse. On 9/1/06, without medications, the claimant still had only a mildly symptomatic mental status examination. [Exhibit 27F-6].

(Tr. 23.) Following his comparison between Dr. Smith's assessment and Plaintiff's mental health status while in prison, the ALJ engages in a discussion of Plaintiff's longitudinal

36

mental health history from 2006 through 2010, lending support to his implicit rejection of Dr. Smith's opinion. (*Id.*) Thus, while the ALJ did not engage in a detailed analysis of Dr. Smith's findings, his decision, and the record as a whole, support the ALJ's rejection of Dr. Smith's opinion to the extent it was inconsistent with the RFC.

While this Court acknowledges the brevity of the ALJ's analysis as it relates to medical sources in the record as well as the ALJ's failure to strictly comply with the Appeals Council's instructions, substantial evidence supports the ALJ's decision, and "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)). Accordingly, and for the foregoing reasons, Plaintiff's arguments as to Drs. Sunbury, Smith, Terry, and Haskins present no basis for remand in this case.

## VI.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this Report and Recommendation.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 6, 2013

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**